## The Western Saving Fund Society of Philadelphia *et al. versus* The City of Philadelphia *et al.*

Whenever a municipal corporation engages in things not public in their nature, it acts as a private individual,—no longer legislates, but contracts,—and is as much bound by its engagements as is a private person.

It is not in the power of the legislature to authorize the violation of such a contract.

APPEAL IN EQUITY from the Court of *Nisi Prius*.

This was a bill in equity between the same parties as the preceding case, setting forth substantially the same facts, and praying for an injunction to restrain the defendants from interfering with the management of the Philadelphia Gas Works, under the provisions of an Act of Assembly passed the 20th April 1858: *Pamph. L.* 347. The court below granted the injunction, from which an appeal was taken by the defendants.

*Hirst*, for the appellants.

*Gerhard* and *Meredith*, for the appellees.

The opinion of the court was delivered by

STRONG, J.—The bill of the complainants prays that the City of Philadelphia, and the Select and Common Councils thereof, may be restrained by the injunction of this court, from proceeding under the provisions of a certain Act of Assembly of this Commonwealth, passed on the 20th of April 1858, entitled "A Supplement to the Act to incorporate the City of Philadelphia;" and from any attempt to invalidate the trusts now existing in the present Trustees of the Philadelphia Gas Works, or the security of the holders of the gas loans, or the system under which the said trusts have been heretofore conducted; or from attempting to change the mode by which the board of trustees has heretofore been elected and constituted, and also from increasing or changing the number of said trustees from their present number of twelve. The bill also prays that the existing trustees may be enjoined against admitting into their board any persons who may be elected under the said Act of Assembly, and against permitting any such persons to

intermeddle, interfere, or participate in the said trusts, or in the business of the said board, or the conduct of the Philadelphia Gas Works.

The cause was heard upon bill and answer, before a single judge sitting at *Nisi Prius*, and an injunction, as prayed for, was granted against the present trustees. An injunction was also decreed against six persons elected under the above-mentioned Act of Assembly (they having been made parties to the bill), restraining them from acting as trustees of the said Philadelphia Gas Works, and from intermeddling, interfering, or participating with or in the said trust, or the business of the said board, or the conduct of the said Philadelphia Gas Works. From this decree the defendants have appealed.

The answer admits all the material facts charged in the bill, and thus the following case is presented.

The Philadelphia Gas Works originated in an attempt by the city councils to create a *quasi* corporation, by an ordinance passed on the 21st of March 1835. By the terms of that ordinance, persons were authorized to subscribe to a stock capital amounting in the aggregate to $100,000, and pay their subscriptions into the city treasury. The subscribers were to receive certificates for their stock, which entitled them to the profits arising from the manufacture and sale of gas. The ordinance expressly stipulated, that the city should not be liable for anything beyond the amount received from the subscribers. It also provided, that the gas works should be under the exclusive management of twelve trustees, who should be elected by the Select and Common Councils of the city, each council electing one-half; and the term of their office was so arranged, that one-third of the members of the board should be elected each year. The city also reserved the right, at any time when the Select and Common Councils might deem it expedient, to take possession of the works and convert the stock into a loan redeemable in twenty years, with interest payable semi-annually. It would seem to have been the purpose of the city, to cast upon the stockholders all the risk of the enterprise, reserving to itself the right to take the property if it should turn out profitable. Under this ordinance, the necessary stock was subscribed and paid, the trustees were elected, and the works constructed. The enterprise proved successful, and the demand for gas increased beyond the ability of the trustees to supply with their limited capital. To meet this state of things, subsequent ordinances were passed, from time to time, authorizing loans for the extension of the works. They provided that the money should be borrowed by the city, on the requisition of the trustees of the gas works, and that city certificates should be issued to the loanholders. The faith of the city, and also the property of the gas works, were pledged for the repayment of the loans. A sinking fund was also created out of

the proceeds of the manufacture and sale of gas, which was set apart as security to the loanholders, before any profits could be distributed to the stockholders. By the first of these ordinances, passed December 22d 1836, it was enacted, that the money arising from the manufacture and sale of gas, should no longer be paid into the city treasury, but that the receipt and payment of all moneys, on account of the gas works, should thereafter be confided to the trustees of said works. On the 14th of January 1841, an ordinance was passed which provided that the city should, on the first of March then next following, take possession of the gas works in their own right, under the privilege originally reserved, and that the stock should be converted into a loan. This ordinance declared, however, that the works should continue under the direction and superintendence of the board of trustees then existing, with all the powers they then possessed, until it should be otherwise provided. Thus they ceased to be trustees for the stockholders, but were thenceforth trustees for the city and for the loanholders. The city then became the owner, and a satisfactory arrangement was made with the original proprietors. Then followed the ordinance of June 17th 1841, the provisions of which lie at the bottom of this case. It authorized a further loan for the purpose of extending the works, the money to be borrowed in such sums as might be required by the trustees, and for which certificates were to be given. These were made transferable at the office of the Philadelphia Gas Works, where also the interest was payable, at such rates, not exceeding five per cent., as the trustees should determine. All the net profits of the works, after the payment of the interest upon the existing loans, were directed to be set apart to constitute a sinking fund; and the faith of the city, and also the sinking fund, the property of the gas works, their income and profits, were pledged for the punctual payment of the interest, and for the ultimate reimbursement of the principal of *all the loans* made for or on account of the said gas works, as they should become due. "And for the further security of the loanholders of said works," the faith of the city was pledged that the prices of gas, as then fixed, should not be reduced until the distribution of gas by pipes should be completed throughout the city limits, nor at any time so as to reduce the clear profits below eight per centum per annum on the whole amount of the cost of said works, until *all the loans contracted for, or that might thereafter be contracted for,* should be paid. The third section of the ordinance is in these words: "That, for the further security of said loanholders, it is hereby stipulated that the said works shall be controlled and managed by a board of trustees, elected and constituted as heretofore, who shall have the whole control and management of the said works, and of the said sinking fund, and of all other funds belonging to the said works; and the said trus-

[Western Saving Fund Society *v.* The City of Philadelphia.]

tees shall pay no part of the said funds, nor any part of the profits of said works, into the city treasury, but shall apply and appropriate the same, as is directed by this ordinance, until the interest and principal of said loans shall be fully paid, as they become due, to the said loanholders." On the faith of this ordinance $125,000 were obtained, and certificates were given, declaring that they were issued "in pursuance of an ordinance of the 17th of June 1841." The provisions of the ordinance necessarily became a part of the contract with each loanholder, without which it must be assumed he would not have advanced his money; nor did they enure exclusively to the benefit of the holders of that loan. They were stipulated to be for the "further security of all the loans contracted, or that might thereafter be contracted." Whatever may be said about the rights of antecedent loanholders, it is clear that all holders of the loan of June 17th 1841, or of loans subsequently negotiated, are entitled to the benefit of all the provisions of this ordinance, which were intended for their security, unless, in the case of loans subsequently made, the lenders were deprived of these benefits by some new stipulation which necessarily excluded them from the advantages which the ordinance of June 17th 1841, was designed to give to them. We find no such stipulation in any of the subsequent ordinances authorizing loans.

The complainants are the holders of these loans; of that created by the ordinance of June 17th 1841, and of others under subsequent ordinances, passed severally, May 25th 1848, March 15th 1849, January 10th 1850, and March 20th 1851.

On the 20th day of April 1858, an Act of Assembly was passed, which enacted in these words: "That the Select and Common Councils of the City of Philadelphia, are authorized and directed to elect six additional trustees of the Philadelphia Gas Works; each council shall elect three of said trustees, at the last stated meeting in April, A. D. 1858.

"Section 2d. That the said six trustees, after their election, shall meet and divide themselves into three classes; the first class shall serve until February 1861; the second class until February 1860; and the third class until February 1859. Provided, that hereafter the election of said additional trustees shall occur at the same time that the law now provides for the election by councils. That is to say, that in January 1859, six trustees of said Philadelphia Gas Works shall be elected, and so likewise annually thereafter; and all laws inconsistent herewith be and the same are hereby repealed."

Under this act, the bill charges, and the answer admits, that the city councils are about to elect six additional trustees, (which has since been done), and the complainants aver that the enactment is in violation of the constitutions of this state and of the United

[Western Saving Fund Society v. The City of Philadelphia.]

States, inasmuch as it impairs the obligation of the contract existing between the city of Philadelphia and the loanholders, under the ordinance of June 17th 1841, and those subsequently passed. This constitutes the basis of the application for an injunction.

It is obvious that if electing six additional trustees in the manner proposed, and constituting them a part of the board, is a violation of the contract which the city has made with the loanholders, then the Act of Assembly authorizing such election is in direct collision with the constitution, and the injunction ought to remain. The defendants are bound by their engagements, whatever they were, and no statute can relieve them from strict performance. The obligation of their contract does not depend upon the statute. It is antecedent, and superior. The constitutional prohibition was not designed to make contracts any more sacred from violation by the contracting parties than they were before its adoption. Its only purpose was to prevent their being made less sacred.

Nor can there be any doubt that the trust existing in the trustees is a private one, and that the city of Philadelphia is to be regarded as a private corporation, so far as relates to its contract with the loanholders. It was not as a municipality that it dealt with them. As a local sovereign, it had no authority to enter into the business of manufacturing and selling gas, for its sovereignty did not extend to such subjects, any more than it did to almost any other manufacture. It is true, a municipal corporation is not bound by any engagement which prevents a discharge of the duties imposed upon it by its organic law, for the plain reason that such engagements are contrary to law. But when such a corporation engages in things not public in their nature, it acts as a private individual, no longer legislates, but contracts, and is as much bound by its engagements as is a natural person. The distinction between public duties and private business is wide and obvious. It is, perhaps, nowhere better stated than by Chief Justice NELSON, in Bailey v. The Mayor, &c., of the City of New York, 3 *Hill* 531. In speaking of powers granted to a municipal corporation, he remarks, that "regard should be had, not so much to the nature and character of the various powers conferred, as to the object and purpose of the legislature in conferring them. If granted for public purposes exclusively, they belong to the corporate body in its public, political, or municipal character. But, if the grant was for purposes of private advantage, or emolument, though the public may derive a common benefit therefrom, the corporation, *quoad hoc*, is to be regarded as a private company. It stands on the same footing, as would any individual, or body of persons, upon whom like special franchises had been conferred." The contract, therefore, whatever it was, which was made with

the loanholders, complainants in this case, is as unchangeable as if it had been made with a natural person.

This brings us directly to a consideration of the obligation which the city of Philadelphia assumed in the third section of the ordinance of June 17th 1841. What has the city undertaken? What it has undertaken, the law requires should be performed. That law is the contract obligation. Having in the first and second sections created a sinking fund, and pledged it (together with the faith of the city), and all the property and income of the gas works, as security for the repayment of the loans authorized, and of the interest upon them, the councils provide in the third section for the custody and management of the pledge. To effect this, they stipulate that the works, the sinking fund, and all other funds belonging to the said works, in other words, all the hypothecated property, shall be under the control and management of a board of trustees, elected and constituted as theretofore, who shall pay no part of the funds or profit into the city treasury, but shall apply them in discharge of the obligations undertaken to the loanholders. It can hardly be doubted, that the primary design of this stipulation was to keep the pledge entirely out of the hands of the borrower, and prevent the funds from being intermingled with other property of the city, and thus exposed to the hazard of expenditure for other objects than those to which it was exclusively designated. This may be a very valuable stipulation to the loanholder, and contribute largely to his security. It may, therefore, well be supposed to have entered largely into the consideration of the loanholder, when he advanced his money. By the ordinance, it was offered to him *as a further security*, and it cannot now be withdrawn.

But so long as a board of trustees is continued, with the powers which in this ordinance the city engaged they should have, there is no departure from this primary design. The contemplated separation of the trust funds from the general funds of the municipal corporation, is alike maintained, whether the board be composed of twelve or eighteen trustees. The ordinance of June 17th 1841, however, not only stipulated that the gas works should be managed and controlled by a board of trustees, but by a board of trustees, *elected and constituted as heretofore*. It is argued, that this amounts to an engagement that the board shall continue to consist of the same number of trustees as it had been composed of prior to the passage of the ordinance, and that only four shall be elected in any one year, except to fill vacancies. It may be well here to recur to the previous constitution of the board. As has already been seen, the ordinance of March 21st 1835, prescribed that the board of trustees should consist of twelve persons, whose term of office should be three years; that they should be elected by ballot; that two should be

elected every year by each council at the last stated meeting of councils in January; that not more than two members of each council should be trustees at any one time; that vacancies should be filled by special elections to be held by the body in whose delegation in the board of trustees the vacancies might exist; that seven of the trustees should be a quorum, and that they should choose a president out of their number every year, within ten days after their election. Such was the election and constitution of the board of trustees to which the ordinance of June 17th 1841 refers. Embraced within this mode of election and constitution are the designation of the constituent bodies (*i. e.* the Select and Common Councils), the proportion in which each shall elect (*i. e.* each one-half), the manner of election (*i. e.* by ballot), the time (*i. e.* at the last stated meeting of councils in January of each year), the number of trustees (*i. e.* twelve), the number necessary to form a quorum (*i. e.* seven), and the election of the president. Strictly speaking, all these particulars are necessary to make up the mode in which the board was elected and constituted. Now that something more was intended by the third section of the ordinance of June 17th 1841, than that a board of trustees should have charge of all the property pledged for the security of loanholders, is evident from the introduction of the words "elected and constituted as heretofore." Those words are unnecessary and unmeaning, unless they were intended to preserve and perpetuate such a constitution and election as had previously existed, and had existed under the sanction of law. The contracting parties cannot be supposed to have used words without meaning. But how can two boards be said to be constituted alike when the one is composed of twelve and the other of eighteen members, when a majority of the one must always have had the experience of at least one year's service, and the majority of the other may be new men without any experience? The original experiment of a board of twelve had worked well, and the insertion of the provision that the board should continue to be elected and constituted as theretofore, could only have been designed as a protection against a new experiment. The constitution of the board was of prime importance to the loanholders, for the management of all the pledged property was confided to the trustees. To judicious management, knowledge was essential; and that could only be secured by insuring the presence in the board, at all times, of a majority who had enjoyed the opportunity of at least one year's observation. This may well be supposed to have entered into the consideration of the loanholders. It can hardly be contended, with any hope of success, that one who has executed a mortgage to another as a trustee for creditors, can change the trustee without the consent of the creditors. Yet what less is proposed now? There are at present eight members of the board who have been

in office more than one year.   The control of the trust funds is now in the hands of those eight members.   It is there, by contract between the city and the loanholders.   By adding trustees the city proposes to take this power out of the hands of the eight experienced trustees, and commit it to ten inexperienced men. In substance this is a change of the trustees, and destructive of the permanence of the system, on the faith of which the loan-holders advanced their money.   To us it seems to be an attempted violation of the contract between the parties.   Our view also corresponds with that which was taken by this court in another case between the same plaintiffs and the city of Philadelphia, in January 1855.   That, it is true, was a bill filed against the city to prevent its taking the property entirely out of the hands of the trustees; but it directly involved the rights of the loanholders under the third section of the ordinance of July 17th 1841.   The language used by this court at that time was the following: " By the contract with the loanholders, the city has placed the works and their income in the hands of trustees as a security for the loans.   The loans subsequent to that act were contracted on the faith of that pledge.   The city has no more right to disturb the security, than a mortgagor would have to demand a reconveyance without payment of the mortgage debt.   To say that the city does not mean to disturb the security, is nothing to the purpose.   The contract designates the manner in which the trustees are to be appointed. · By that system they are placed on a permanent footing, and are effectually guarded against the changes and consequent mismanagement which might flow from the impulsive action of political parties.   This arrangement was a very material consideration with those who advanced their money on the faith of it, and the city has no right to change the trustees in any other mode than that prescribed by the contract."

This is precisely the view of the contract which we take now. And such being the obligation which the city assumed, no legislation can authorize a change in the election or constitution of the board of trustees.   ·

The decree of the judge at *Nisi Prius* is affirmed, and the appellants are ordered to pay the costs.