# Bower, Appellant, *v.* United Gas Improvement Company.

*Corporations—Gas companies—Regulations—Stoppage of gas—Penalty —Municipalities.*

A gas company which has leased public gas works from a city, may in the absence of any prohibition in the lease require citizens desiring to become consumers of the gas to sign a contract agreeing to submit to a regulation that if the bill for gas is not paid within ten days, the flow of gas may be stopped, and that a penalty of three per cent may be added on the bill if it is not paid within five days after presentation.

A citizen who has signed such a contract has no standing to maintain a bill for an injunction to restrain a threatened shutting off of gas or an imposition of the three per cent penalty.

Argued Oct. 17, 1907. Appeal, No. 77, Oct. T., 1907, by plaintiffs, from decree of C. P. No. 2, Phila. Co., Jan. T., 1906, No. 4,200, dismissing bill in equity in case of Maurice L. Bower et al. v. The United Gas Improvement Company. Before RICE, P. J., HENDERSON, MORRISON, ORLADY, HEAD and BEAVER, JJ. Affirmed.

Bill in equity for an injunction.

WILTBANK, J., filed the following opinion:

### FINDINGS OF FACT.

1. The plaintiffs are residents of Philadelphia and occupy

VOL. XXXVII—8

premises supplied with gas from the mains of The United Gas Improvement Company.

2. The United Gas Improvement Company is a corporation duly organized under the laws of the commonwealth of Pennsylvania, engaged in the manufacture of illuminating gas for sale to the plaintiffs and other residents of Philadelphia.

3. The United Gas Improvement Company, under the terms of a lease between it and the city of Philadelphia, which lease is contained in an ordinance of councils passed November 12, 1897 (ordinances of councils, 1897, page 227), claims the right to levy a penalty of three per cent on all bills for gas consumed which are not paid within five days of the presentation thereof.

4. Sec. 11 of said ordinance provides as follows:

'The said United Gas Improvement Company, its successors and assigns, shall be entitled to enforce the same penalties for nonpayment of bills at the office of the Company within five (5) days after presentation as are now in force in the City of Philadelphia, and to the same remedies against consumers for breaches of their contracts for the supply of gas."

5. The Philadelphia Gas Works were originally constructed under the authority of an ordinance of councils, of March 21, 1835, whereby the powers necessary for the construction and operation thereof were vested in twelve trustees elected by councils. By sec. 5 of said ordinances it was provided, inter alia, as follows:

"The said trustees shall from time to time prepare and submit to Councils, for their approbation, rules and regulations under which the gas may be furnished to private consumers and to the public lamps."

6. By an ordinance of councils of February 8, 1838, it was provided in sec. 4 as follows:

" It shall be lawful for the said trustees to provide, from time to time, such further and other rules and regulations under which the gas may be furnished to private customers, as experience may suggest, and as the said trustees may deem necessary or convenient in the use or consumption of gas."

7. Pursuant to said ordinance of 1838, the trustees of the

gas works, on July 12, 1839, adopted the following rules and regulations:

"Sec. 13. In default of payment for gas consumed, within ten days after a bill is rendered, or in case of a leak or injury done to the meter or pipes within the premises of any consumer, the flow of gas may be stopped until the bill is paid, or the necessary repairs are made.

"Sec. 14. The price of gas will be fixed from time to time by the trustees; and a penalty of three per cent will be added on all bills for gas not paid at their office within five days after presentation."

8. By an ordinance of councils of March 20, 1855, the said trustees were authorized and empowered to take charge of and exercise exclusive control over, and have the management of, the several gas works and all the property appertaining thereto "now in possession of the Corporation of the City of Philadelphia, or that may hereafter be in its possession." Said ordinance further provided:

"And the said Trustees shall have the same power to make contracts or materials, labor and superintendence, to be used and employed in said works and to collect all debts now due or hereafter to become due to the same, as they now have under the ordinances of the Mayor, Alderman and Citizens of Philadelphia, relating to the gas works built under their authority, and to enforce the same rules and regulations for the introduction and consumption of gas, as are now or may be hereafter authorized by the said ordinance or any other ordinances duly enacted."

9. By ordinance of December 30, 1886, sec. 23, the trustees of the Philadelphia Gas Works were abolished, and by virtue of sec. 28 of said ordinance, and of the Act of June 1, 1885, P. L. 37, art. IV, sec. 1, all the powers, duties, incidents and functions of said trustees were vested in the department of public works, bureau of gas, said bureau of gas being created by ordinance of April 4, 1887.

10. By agreement made November 12, 1897, in pursuance of an ordinance of councils approved on the same date, the city of Philadelphia leased to The United Gas Improvement

Company, for the term beginning November 12, 1897, and ending December 31, 1927, all the property, real and personal, collectively known as the Philadelphia Gas Works, with the appurtenances, comprising generally the land, buildings, tenements, machinery, apparatus, tools, mains, pipes, surfaces, meters, and other appurtenances possessed or used by or for the city of Philadelphia in the manufacture, storage, sale, distribution and supply of gas, with authority and power during the term of said lease, to maintain, and to operate said gas works and appurtenances.

11. Said lease provides as follows:

"Clause 11. The price which shall be charged to all consumers, other than the city of Philadelphia, by the said The United Gas Improvement Company, its successors and assigns, shall, until otherwise provided by ordinances of Councils, be one (1) dollar per thousand cubic feet. It shall be competent for Councils to reduce these charges from time to time by ordinances; but said ordinances shall not at any time reduce the price below the following:

"Until and including the thirty-first day of December, 1907, ninety (90) cents per thousand cubic feet.

"From January 1st, 1908, until and including December 31st, 1912, eighty-five (85) cents per thousand cubic feet.

"From January 1st, 1913, until and including December 31st, 1917, eighty (80) cents per thousand cubic feet.

"From January 1st, 1918, until and including December 31st, 1927, seventy-five (75) cents per thousand cubic feet.

"The said The United Gas Improvement Company, its successors and assigns, shall be entitled to enforce the same penalties for nonpayment of bills at the offices of the Company within five (5) days after presentation as are now in force in the city of Philadelphia, and to the same remedies against consumers for breaches of their contracts for the supply of gas.

"But it is distinctly understood and agreed that nothing herein contained shall give to said The United Gas Improvement Company, its successors or assigns, any lien or claim upon a property for a tenant's or occupant's gas bills, or

give the right to said The United Gas Improvement Company to refuse to furnish gas to any subsequent tenant or occupant of said property by reason of prior tenant or occupant having failed to pay the bill: Provided, however, That said The United Gas Improvement Company, its successors or assigns, shall not be required to furnish gas to any person, firm or body corporate indebted for arrearages due for gas theretofore supplied to them. ·

"Bills shall not be rendered more frequently than are now rendered to various classes of consumers."

12. Said lease further provides:

"Clause 12. The United Gas Improvement Company, its successors or assigns, shall pay to the city of Philadelphia, in each year during the continuance of this agreement, as follows, viz.:

"Upon all gas sold prior to January 1st, 1908, all sums received by them in excess of ninety (90) cents per thousand cubic feet.

"Upon all gas sold after December 31st, 1907, and prior to January 1st, 1913, all sums so received in excess of eighty-five (85) cents per thousand cubic feet. ·

"Upon all gas sold after December 31st, 1912, and prior to January 1st, 1918, all sums so received in excess of eighty (80) cents per thousand cubic feet.

"Upon all gas sold after December 31st, 1917, and prior to January 1st, 1928, all sums so received in excess of eighty (80) cents per thousand cubic feet.

"Statements shall be rendered and payments made under this clause by the lessee to the city as follows: Within twenty-five (25) days after the expiration of each quarter of each year for which any payment is to be made, beginning with the quarter preceding the first day of January, 1898, said The United Gas Improvement Company shall file with the Controller of the City of Philadelphia a statement sworn to by its President or Vice-President or by its Secretary or Treasurer, which shall state the quantity of gas measured in cubic feet sold hereunder within the quarter ending with the last day of the preceding month, the amount of money collected for

such sales, or for sales in any previous quarter, and the amount of money due and payable to the City of Philadelphia under the provisions of this clause out of such receipts; and shall make payment to the City Treasurer of such amount so ascertained to be due to the City of Philadelphia hereunder within five (5) days after the expiration of said period of twenty-five (25) days. The City of Philadelphia shall have the right at all reasonable hours during the continuance of this contract, by its proper officers, to examine those books of the lessee which show the amount of gas so sold and paid for, so as to verify the correctness of said statements."

13. In accordance with clauses 11 and 12 of said lease the defendant has paid to the city of Philadelphia sums of money aggregating $3,608,159.94 in quarterly payments from January 1, 1898, to July 1, 1905.

The aforesaid penalty for nonpayment of bills was continuously enforced by the trustees of the Philadelphia Gas Works and by the bureau of gas, successively, from 1839 until 1898.

14. The defendant has not compelled the payment of the aforesaid penalty of three per cent by the plaintiffs or other consumers of gas, by threatening to cut off and by cutting off the supply of gas of consumers who, having incurred the said penalty, refused to pay the same within ten days after the date of presentation of bills. The defendant has exercised its right, under sec. 13 of the rules and regulations above set forth, in the event of default in payment for gas consumed within ten days after a bill was rendered, to stop the flow of gas until the bill was paid; but this defendant has never stopped the flow of gas for nonpayment of a penalty, as averred in paragraph 4 of the bill.

15. On or about September 25, 1901, the plaintiff, Maurice L. Bower, applied for gas to be supplied under the company's rules and regulations to premises No. 426 North Eighth street, and signed an application, a copy of which, marked exhibit "A," is annexed to the answer, whereby he agreed to pay for the same promptly at the regular price and according to the rules of the company. On or about March 8, 1904, the defendant collected from Maurice L. Bower two cents

as a penalty for nonpayment within five days of a bill presented on or about March 1, 1904, for gas consumed on said premises.

16. On or about March 18, 1902, the plaintiff, Charles S. Aitken, applied for gas to be supplied under the company's rules and regulations to premises No. 440 Salford street, and signed an application, a copy of which, marked exhibit "B," is annexed to the answer, whereby he agreed to pay for the same promptly at the regular price and according to the rules of the company. On or about September 18, 1903, the defendant collected from Charles S. Aitken the sum of sixteen cents as a penalty for the nonpayment within five days of a bill presented on or about September 1, 1903, for gas consumed on said premises.

17. On or about May 8, 1896, the plaintiff, James J. Doran, applied in writing to the city of Philadelphia for gas to be supplied "under the terms and conditions hereinbefore stipulated" to premises 2212 Dickinson (now Firth) street. Subsequent to the aforesaid lease between the city of Philadelphia and the defendant, the defendant continued to supply gas to the said premises, and on or about February 20, 1903, collected from James J. Doran, forty-nine cents as a penalty for the nonpayment within five days of a bill presented on or about February 10, 1903, for gas consumed on said premises.

18. On or about June 28, 1904, the plaintiff, John Allsback, Jr., applied for gas to be supplied under the company's rules and regulations to premises No. 60 South Second street, and signed an application a copy of which, marked exhibit "C," is annexed to the answer, whereby he agreed to pay for the same promptly at the regular price and according to the rules of the company, On or about September 17, 1904, the defendant collected from John Allsback, Jr., twenty-nine cents as a penalty for the nonpayment within five days of a bill presented on or about September 7, 1904, for gas consumed on said premises.

19. A copy of the rules and regulations referred to in said applications, marked respectively exhibits "A," "B," and "C," is annexed to the answer marked exhibit "D." A copy of said

120 BOWER, Appellant, *v.* UNITED GAS IMPROV. CO.

Findings of Fact—Opinion of Court below.   [37 Pa. Superior Ct.

rules and regulations were also printed upon the back of every bill rendered by the defendant to consumers of gas. All gas consumed by the plaintiffs, Maurice L. Bower, Charles S. Aitken, James J. Doran and John Allsback, Jr., was furnished by the defendant in accordance with their respective written applications, as above set forth and in each instance the penalty of three per cent was collected by the defendant, in accordance with said rules and regulations, and in accordance with their respective contracts. A great majority of the consumers of gas in the city of Philadelphia have signed applications in the forms herein set forth, and have expressly agreed to be bound by the rules and regulations aforesaid.

20. The defendant has collected, in penalties from the consumers of gas in the city of Philadelphia, many thousands of dollars.

21. Defendant is by law obliged to furnish gas to all persons residing in the city of Philadelphia occupying premises therein who apply therefor and comply with the defendant's rules and regulations, and furnishes gas on credit to large numbers of persons of small means, against whom it is impossible to collect the amounts due by process of law.

22. Defendant renders bills quarterly except in cases where a consumer requests a monthly bill. Where a bill is rendered quarterly, defendant's inspector reads the meter, on an average, two weeks before the bill is rendered, and at the time of reading the meter the inspector leaves with the consumer or with one of his family a written statement of the quantity of gas indicated by the meter to have been consumed, from which, by comparison with the last previous reading, the consumer may readily calculate the amount of the bill about to be rendered. Where a bill is rendered monthly the inspector reads the meter, on an average, one week before the bill is rendered, and at the same time leaves with the consumer a written statement of the quantity of gas consumed.

### OPINION.

The United Gas Improvement Company possesses franchises duly conferred by its charter, and as a business agency

it has the power to transact business as an individual might, save as restricted by its articles of incorporation. It may, therefore, in operating its plant and furnishing citizens with illuminating gas, prescribe rules, regulations and conditions, not only for the manufacture of its product, but also for the sale of it to the public at large. In taking the leasehold of the property from the city, it stipulated not to prescribe certain rules. With respect to these, therefore, as well as to rules exceeding its charter limitations, it must be held incapable of enforcing them. The rule or regulation complained of by the plaintiffs, if not of this prohibited character and if such as an ordinary trading concern might adopt, must be respected unless it is against public policy.

The plaintiffs contend that the regulation for the demand of three per cent on arrears remaining due beyond a certain time, is not a proper regulation of trade. If we are to regard it as prescribing a penalty for nonpayment of moneys due, it is against the law, because it is not warranted by any effective statutory provision, but depends only upon municipal ordinance: Emery v. Boyle, 200 Pa. 249; whilst if we are to regard it as a provision for liquidated damages, it can secure to the defendant company nothing more than actual compensation for the loss incident to the plaintiffs' deferred payments. As we have understood the argument made in behalf of the plaintiffs, it is to be considered, further, that the regulation named, even if not open to the two objections just stated, cannot be countenanced by a court of equity, inasmuch as it is against public policy.

The regulation or stipulation to the effect that a failure to pay for the consumption of gas, at a time named and after notice provided for, must result in one of two consequences, either in the shutting off of the supply from the premises of the debtor, or in his payment of three per cent as compensation for his delinquency, is one that, as a trading concern, the defendant might insist upon, independently of any terms of the grant by the city to it. Whether or not it is regarded as derived from the municipal authority, it is valid and effective by the light of the decisions of the Supreme Court upon the

judicial investigation by that court of the powers of the city in supplying gas to its inhabitants, from the year 1838 to the time of the creation of the trustees of the City Gas Works and thence to the time of the contract of the city with the defendant company.

In view of the authorities, to which we shall later briefly refer, the question of public policy suggests the broader ground for the plaintiffs' contention. It may be urged that the rule for what is called the penalty operates to place a delinquent consumer under pressure or duress, inasmuch as when behindhand in his indebtedness he finds himself confronted with the alternative of paying what he may regard as neither lawful interest nor a lawful penalty, or of being deprived of the essential comfort of artificial light. He is forced to this position although ready to pay the manufacturer the arrears due by him, plus the legal rate of interest for his delay, and must elect to submit to a charge which is not prescribed by statute, or to lose the material convenience of a supply of light, unattainable elsewhere as conveniently, and which is undoubtedly more advantageous to him in respect of stability and cheapness than illumination from other sources, as, for instance, from applied electricity, or the burning of oil. And yet these considerations are not weighty. They originate, it must be remembered, in the failure of one the parties to a contract to duly perform his part, and his complaint is not free from the criticism that it disregards certain circumstances which make against him, and for some of which he is exclusively responsible.

By nonpayment at the maturity of his account, each of the plaintiffs became one of a class who had knowingly exposed themselves to a consequence with which they were familiar and which they had deliberately invoked by the terms procuring the gas for them. No discrimination was made against him as an individual, nor did any action of the defendant procure a discrimination against him as one of this class. By his failure to pay at the date he had stipulated for, and by permitting the lapse of the interval of grace allowed him, he ranged himself in the company of delinquents. No one placed

him there but himself. And he had agreed to stand there in the contingency which he later created.

The defendant, it is true, has substantially the monopoly of the supply to the city, and as it derives its right from the municipality it must be required to afford a supply to the masses upon reasonable terms and without more than a reasonable compensation. Equity would take hold of and check any course of action indicating that unfair exercise of power which has always made a monopoly odious. But unless we find that a citizen proposing to use gas and constrained to purchase it from one company because he can get it from no other source as satisfactory, in signing an agreement that he will pay at a certain rate for use and at an additional rate upon his neglect to comply with his contract, is under such duress as to require a chancellor to direct a modification of the terms so that the consumer obtains all that he bargained for and the provider must take less, we cannot conclude that relief is of right.

This brings us to the true bearing of the question of public policy. The prompt collection of its returns is necessary to the defendant's economical and efficient working of its plant and to a copious and steady supply to its customers according to its obligations. It is necessary, also, to the payment of its rentals to the city. The permitted increase of arrears on the part of all who failed to pay what they owed would seriously impair the power of the defendant to give good service generally. It might also lessen the revenue of the lessor. The laxity would become general and uncertainty ensue. The delinquents might have to face evils wider than that of which they complained, as, for instance, a higher rate and a poorer quality; and these considerations make it clear that the regulation for the so-called penalty operates beneficially if we have in mind the welfare of all consumers alike. In a large business combination for securing one of the necessities of life, essential in every hour of every day, and reaching to great manufacturing plants as well as to domestic privacy, where darkness might involve extensive loss and even calamity, all parts of the system should work harmoniously; and when

consumers have agreed to a scheme that is practical, broad and efficacious, there is no merit in the contention of a few individuals of one of the classes that they, perhaps themselves an inconsiderable minority of that very class, must be allowed exceptional consideration.    Even of this class a majority might prefer that the regulation should prevail.    The interests of a few must, in equity, give way to the general interests of the public, and these last, it is obvious, are subserved by the regulation for the penalty.

There is also a circumstance established by the plaintiffs which must weaken the argument that they are aggrieved to a peculiar degree by the demand for the three per cent on their accounts in arrear.    It was admitted for them at bar that upon nonpayment within the stipulated time the defendant might of right cut off the supply from their premises.    If such was the case, and the point appears indisputable, Miller v. Wilkes-Barre Gas Co., 206 Pa. 254; Com. v. Phila., 132 Pa. 288, their decision that the payment of the penalty was preferable to this loss must be regarded as an acceptance by them of a consequence less serious than one which they had incurred, which was legal, and which they had no right to avert, and did not ask to avert, in this proceeding.    They in fact compromised for an admitted lapse from their agreement.

We therefore conclude that the plaintiffs have not shown a case in equity which entitles them to relief on the broad ground we have considered.

We turn to the commercial aspect of the inquiry.

It has been held that the city of Philadelphia when it undertakes the manufacture and sale of gas acts as a private corporation, and has the same powers with respect to the conduct of its business as are possessed by such a body.    This was adjudged in the Western Saving Fund Society v. Phila., 31 Pa. 175–185; Wheeler v. Phila., 77 Pa. 338.

The contracts which a municipal corporation may make for the purpose of supplying the inhabitants with gas-light in their streets and houses, relate to the "things of commerce," as distinguished in the civil law from the "things public,"

which are regulated by the sovereign. Such contracts are not made by the municipal corporation, by virtue of its powers of local sovereignty, but in its capacity of a private corporation. The supply of gas-light is no more a duty of sovereignty than the supply of water: LEWIS, C. J., speaking for the court in Western Saving Fund Society v. Phila., 31 Pa. 175.

In the Western Saving Fund Society v. Phila., a later adjudication, 31 Pa. 185, it was said for the court by Mr. Justice STRONG: " As a local sovereign it had no authority to enter into the business of manufacturing and selling gas, for its sovereignty did not extend to such subjects any more than it did to almost any other manufacture. . . . When such a corporation engages in things not public in their nature it acts as a private individual; no longer legislates, but contracts, and is as much bound by its engagements as is a natural person. The distinction between public duties and private business is wide and obvious."

In the Girard Life Insurance Co. v. Philadelphia, 88 Pa. 393, this doctrine was restated and affirmed. See also Brumm's Appeal, 22 W. N. C. 137; Bailey v. Phila., 184 Pa. 594.

In Miller v. Wilkes-Barre Gas Co., 206 Pa. 254, Mr. Justice DEAN said: "That a municipality or corporation furnishing water or gas may by ordinance or by-laws make reasonable rules and regulations to insure the payment of bills, among others that of stopping the supply unless all arrearages are paid, whether owing by the tenant in possession or his predecessor, has been settled."

The provision complained of at bar has been effective in Philadelphia for about thirty-six years; and a like provision with respect to water rents has been enforced for about fifty years. In Girard Life Ins. Co. v. Phila., 88 Pa. 393, a bill was filed to restrain the city from cutting off the supply of water to premises purchased at sheriff's sale. The water department had claimed the right to shut off the supply unless payment was made of arrears for three years, together with a penalty of fifteen per cent. It was admitted that the city had the right to collect one year's arrears as a condition of supplying

water, but it was contended that the ordinance of councils did not authorize the water department to demand more than one year's rent. That ordinance was sustained as a reasonable provision for enforcing payment.

We find authorities in the books which are applicable by analogy to the case before us and sustain the contention of the defendant as to the validity of the provision for the payment of three per cent upon default: Phila. v. Cooke, 30 Pa. 56; Commonwealth v. Wagner, 24 W. N. C. 171; Bray v. Phila., 11 W. N. C. 202; Altoona v. Shellenberger, 6 Pa. Dist. Rep. 544; Smith v. Scranton Gas & Water Co., 5 Lack. Leg. N. 235; Appeal of City of Harrisburg, 107 Pa. 102; Foster v. Trustees of Gas Works, etc., 12 Phila. 511; Trimmer v. Water Co., 4 Kulp, 293.

All these cases support in one form or another regulations for the coercion of payment of arrears due for the supply of great necessities like gas and water. Taxes demanded upon proper assessment from citizens for the privileges of residence may in some respects be regarded as analogous to payments made for participation in the general use of artificial light supplied by municipal arrangement with the manufacturer. The legislature has sanctioned the enforcement of prompt payment of taxes by a penalty: Vide Act of April 17, 1861, P. L. 354; Act of June 30, 1885, P. L. 193.

The cases quoted in the earlier part of this discussion are directly to the point, and therefore we need not seek the aid of other decisions, however applicable they may be, by way of stating the principles of law which must guide us herein.

The bill should be dismissed. Let due notice be given and a form of decree be presented.

*Error assigned* was decree of the court dismissing the bill.

*Walter Biddle Saul,* with him *Daniel R. Rothermel,* for appellants.—Equity will regard a penalty as intended to secure the fulfillment of a contract and limit a recovery to the loss actually sustained, notwithstanding the stipulation of the parties on the principle that one party should not be allowed

to profit by the default of another: Louden v. Taxing Dist. of Shelby County, 104 U. S. 771; Cotheal v. Talmage, 9 N. Y. 551; Streeper v. Williams, 48 Pa. 450; Manhattan Life Ins. Co. v. Wright, 126 Fed. Repr. 82.

There is not a single decision that can be found upholding the right of a private corporation to levy a penalty by contract without express statutory authority, nor is there a single case where the question of a penalty is raised, where it is not held void: Richardson v. Crandall, 48 N. Y. 348; Atcheson v. Mallon, 43 N. Y. 147; Anderson v. Jett, 89 Ky. 375 (12 S. W. Repr. 670); Brown v. First Nat. Bank, 137 Indiana, 655 (37 N. E. Repr: 158); Fuller v. Dame, 35 Mass. 472.

In every case, without exception, where equity has intervened to relieve against a penalty, it has been because the person seeking the aid of the court had, by contract, bound himself to pay a penalty.

The councils of the city of Philadelphia cannot by ordinance confer the right to levy a penalty such as is here involved on a private corporation: Bailey v. Philadelphia, 184 Pa. 594; Lesley v. Kite, 192 Pa. 268; Philadelphia v. Brabender, 201 Pa. 574.

*R. Stuart Smith* and *John G. Johnson*, with them *Charles E. Morgan*, for appellee.—The city of Philadelphia, in the capacity of a private corporation manufacturing and supplying gas, had power to adopt and enforce the regulation of which the plaintiffs complain: Western Saving Fund Society v. City of Philadelphia, 31 Pa. 175, 185; Wheeler v. Phila., 77 Pa. 338; Bailey v. Phila., 184 Pa. 594; Com. v. Phila., 132 Pa. 288; Brumm's App., 22 W. N. C. 137.

The United Gas Improvement Company has precisely the same right to adopt this regulation as the city had; the only conditions are that the regulation must not be unreasonable and that the consumer must have had notice of the regulation in order to be bound by it: Kittanning Borough v. Nat. Gas Co., 26 Pa. Superior Ct. 355; Girard Life Ins. Co. v. Philadelphia, 88 Pa. 393; Com. v. Philadelphia, 132 Pa. 288; Phila. v. Cooke, 30 Pa. 56; Com. v. Wagner, 24 W. N. C. 171;

Foster v. Trustees of Gas Works, etc., 12 Phila. 511; Trimmer v. White Haven Water Co., 4 Kulp, 293; Bray v. Phila., 11 W. N. C. 202; Brumm's Appeal, 22 W. N. C. 137; Altoona v. Shellenberger, 6 Pa. Dist. Rep. 544; Smith v. Scranton Gas & Water Co., 5 Lack. Leg. N. 235.

OPINION BY HEAD, J., October 12, 1908:

The city of Philadelphia is the owner of an extensive plant constructed to enable it to manufacture and distribute to its citizens gas for light and heat. For upwards of a half century the city itself operated its plant and during that period adopted and continuously enforced certain regulations deemed necessary to secure payment from the consumers of the amounts due for gas furnished. Among these were the following, adopted in pursuance of an ordinance of city councils enacted in 1838, to wit:

"Sec. 13. In default of payment for gas consumed, within ten days after a bill is rendered . . . . the flow of gas may be stopped until the bill is paid, etc.

"Sec. 14. The price of gas will be fixed from time to time by all the trustees and a penalty of three per cent will be added on bills for gas not paid at their office within five days after presentation."

The practical necessity and reasonableness of some such provisions become apparent when we consider that the consumers supplied now number about 250,000 and that gas is furnished, as the court finds, "on credit to large numbers of persons of small means against whom it is impossible to collect the amounts due by process of law."

During a large portion of the same period the city, by means of another plant constructed for that purpose, furnished, and still continues to furnish, to the citizens a supply of water. Regulations, similar in character with those already quoted, were duly adopted and have been steadily enforced against consumers of water who allowed themselves to become in default, the chief difference being that a percentage was added, after default, to the bill of the water consumer, much larger than was demanded from the consumer of gas.

It has been definitely settled that in thus undertaking to furnish to its citizens supplies of water and gas, the city was not discharging any municipal obligation or exercising any power which it possessed only because it was a municipality, but was acting in the capacity and exercising the powers of a private corporation: Western Saving Fund Society v. City of Philadelphia, 31 Pa. 175; s. c., 31 Pa. 185; Wheeler v. Phila., 77 Pa. 338; Baily et al. v. Phila., 184 Pa. 594. In the case first cited Chief Justice LEWIS said: "But the contracts which a municipal corporation may make for the purpose of supplying the inhabitants with gas light. in their streets and houses relate to the 'things of commerce,' as distinguished in the civil law from the 'things public,' which are regulated by the sovereign. Such contracts are not made by the municipal corporation, by virtue of its powers of local sovereignty, but in its capacity of a private corporation. The supply of gas light is no more a duty of sovereignty than the supply of water."

Acting thus in the capacity of a private corporation what power did the city possess to adopt and enforce regulations to insure payment of gas bills and establish conditions, upon the performance of which, those who had broken their contracts by becoming in default, might condone the breach and again entitle themselves to the rights and privileges which flowed from their contracts but would cease upon their breach?

In Miller v. Wilkes-Barre Gas Co., 206 Pa. 254, the question is thus answered by Mr. Justice DEAN: "That a municipality or corporation furnishing water or gas may by ordinance or by laws make reasonable rules and regulations to insure the payment of bills, among others, that of stopping the supply unless all arrearages are paid, whether owing by the tenant in possession or his predecessors, has been settled: Girard Life Ins. Co. v. Phila., 88 Pa. 393; Brumm's Appeal, 22 W. N. C. 137." It is clear therefore that a corporation engaged in furnishing a supply of water or gas to the public may lawfully enter into contracts with consumers in which it expressly reserves the right to stop the supply in case of a breach of the contract by the consumer's neglect or refusal to pay the stipulated rates at the time and place agreed on.

It is not easy then to perceive upon what ground one, who has voluntarily defaulted in the performance of a contractual obligation, could invoke the aid of a court of equity to restrain the other party from exercising a right, expressly reserved in the contract and declared by the courts to be reasonable and not an abuse of its corporate powers. If the exercise itself of the right to shut off the supply to those who become in default furnishes no ground for interference by a court of equity, it would seem to follow that a mere threat to exercise such right would create no foundation upon which a complainant could rest a bill.

In Girard Life Ins. Co. v. Philadelphia, 88 Pa. 393, the complainant averred in its bill that it had become the purchaser, at sheriff's sale, of certain premises in the city; that it desired to have a supply of water furnished by the city and was willing to pay for the same; that it had tendered the water rent for one year which was declined and that it had been informed by the water department, that the water rent for three years was due, together with a penalty of fifteen per cent, and that unless said arrears, with the penalty, were paid, the water supply would be stopped; the bill prayed for an injunction to restrain the defendant from cutting off the water supply. It was held that the complainant had no equity to restrain the city and that payment of all the arrearages claimed could be enforced by the city in the manner prescribed by its ordinance.

The controlling principle of this case, having been reaffirmed in a later one to which we shall presently refer, it becomes our duty to apply it to the facts now before us which may be briefly stated thus. The defendant is a private corporation, "duly organized under the laws of the commonwealth of Pennsylvania, engaged in the manufacture of illuminating gas for sale to the plaintiffs and other residents of Philadelphia." By virtue of a lease made in 1897, the execution of which was duly authorized by councils, the defendant took over the operation of the gas plant owned by the city. As the case is presented to us we have but little concern with the terms of the lease further than to observe that it contains nothing prohibiting the lessee from exercising its corporate right to adopt and enforce the regulations to secure payment of bills which we have already quoted

and which had so long been in force and they were accordingly adopted. The defendant therefore has, in this respect, precisely the same powers, which we have seen were possessed by the city itself whilst acting in the capacity of a private corporation supplying its citizens with gas. Each prospective consumer was obliged to sign an application in which he had formal notice of these regulations and agreed to be bound by them. This bill was originally filed by five residents of the city and each one of them after signing such an application, had become a consumer of gas supplied by the defendant. Later, by leave of the court, four other persons were added. It appeared in the case of M. L. Bower, one of the complainants, that during the period from September, 1901, to February, 1905, when his account was closed, he had made default twice and the extra percentage or penalty of thirty cents in one instance and fifty cents in the other was paid by him. The plaintiff Doran had defaulted sixteen times between 1898 and January, 1905, and his extra payments aggregated $2.01. None of the originally named parties were called as witnesses and the record does not disclose any objection made by them or any of them to the payments which, under their contracts, had been demanded and made. Brenzel, whose name was added as a party, testified that after a default he went to defendant's office and presented his bill with the money called for on its face. Observing the clerk in charge "adding the penalty" he refused to pay it and the bill and his money were returned. Shortly after he received a notice that if he did not pay by such a day the gas would be shut off and he then sent a check because "the better way for me to do was to go pay it rather than have the gas shut off." The bill prayed, inter alia, for an injunction restraining the defendant from adding the three per cent or any other penalty to bills not paid at the contract time, from shutting off the gas in case of a refusal to pay such additional sums and for a return of those previously collected.

Have the complainants, by this showing, presented a case that ought to impel a court of equity to strike down a regulation which has existed for upwards of half a century, of which the complainants had ample notice before entering into any relation

with the defendant and by which each one of them expressly agreed to be bound when he signed the application which entitled him to receive a supply of gas? The regulation is not attacked on the ground that it is unreasonable, arbitrary or unconscionable. The argument is that a consumer of gas who neglects or refuses to pay his bill at the stipulated time simply becomes the debtor of the company to that extent as he would to the merchant who sold him goods on credit. That the law has declared legal interest to be the only compensation that can be rightfully demanded or recovered for such default and therefore the defendant ought to be restrained from adding three per cent to the bills of those in default and content itself with the addition of legal interest.

The argument seems to us to be more plausible than sound. The city or the present defendant, its lessee, engaging in the business of supplying water or gas to the public, is not in the position of a merchant who may pick and choose his customers, extending credit to those he may consider financially responsible and refusing it to all others. But the defendant is, as the court below finds, "by law obliged to furnish gas to all persons residing in the city of Philadelphia occupying premises therein who apply therefor and comply with the defendant's rules and regulations." No exception is taken to this conclusion. The contract made by each consumer is to continue indefinitely so far as the defendant is concerned, that is to say during the pleasure of the consumer. He may end it at any time, the defendant cannot, unless there has been a breach. When the consumer has voluntarily ceased to perform the conditions upon which the obligation of the defendant rests, it would be anomalous to say that the latter could not in turn determine its obligation. But it seems to us the complainants ask us to say not only that the consumer may end his contract when he chooses,—for this would be conceded—but that he may break it at pleasure and then resume it at will, without performing reasonable conditions imposed by the defendant, not as a penalty for the nonpayment of a debt past due, but as the price of reviving and keeping in force the right to have a future supply of gas under the terms of the broken contract.

A prospective consumer could not go into a court and compel the defendant to furnish a supply of gas unless he would agree to observe and be bound by every reasonable regulation that has been adopted relating to such supply. The regulation now attacked has never been declared to be unreasonable, nor has it been regarded by the courts as a penalty for the nonpayment of a sum of money at a stipulated time.

Were the company to waive its right to shut off the gas, and undertake to collect by legal process the money that had become due for a previous month or quarter, adding thereto three per cent, we would have before us the question argued at length by the able counsel for the appellants. The consumer in default does not pay the additional three per cent under stress of legal proceedings to collect it, but because he does not wish the company to exercise its conceded right to shut off the gas and thus terminate the relation between them.

We have already seen in Girard Life Ins. Co. v. Phila., 88 Pa. 393, that the plaintiff was held to have no equity to restrain the defendant from shutting off the water supply because the plaintiffs refused to pay three years' water rent due from a former tenant with the addition of fifteen per cent, under the city regulation then in force. Had the court, in that case, regarded the addition of fifteen per cent to the bill as an attempt to impose an illegal penalty, merely for the nonpayment of a debt at a stipulated time, the regulation authorizing it would have been stricken down and the bill sustained at least to that extent. But in Com. ex rel. v. Phila., 132 Pa. 288, where a similar question arose with relation to a gas supply, it was held the case was ruled by the former decision and that the regulation was reasonable and valid. The necessity for it is strongly stated by the late Judge THAYER whose opinion was practically adopted as that of the Supreme Court.

Upon a careful review of the entire record we are all of opinion the complainants have shown no equitable right to the relief prayed for.

Decree affirmed.